UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                             :

CHARLES LIPSON, DOUG POTOLSKY,     :
SAMUEL COOPER, and STEVE ISRAEL,  :  Civ. Action No. _____
                             :

               Plaintiffs,     :        **COMPLAINT**
     -against-              :    **AND JURY DEMAND**
                             :

CHRISTOPHER J. JEFFERY and      :
ORDERUP, INC.,                :

             Defendants.     
------------------------------------------------------------ X

       Plaintiffs Charles Lipson, Doug Potolsky, Samuel Cooper and Steve Israel, through their

undersigned counsel, allege as follows:

## NATURE OF THE ACTION

       1.    This is a Federal securities fraud action by the original "angel" investors in

OrderUp, Inc. ("OrderUp"), a startup online restaurant delivery company, for damages resulting

from a fraudulent scheme by Christopher J. Jeffery ("Jeffery"), its founder and chief executive

officer, to get them to tender in April 2014 for nominal consideration their $850,000 worth of

equity interests in OrderUp  so that Jeffery would not have to share the tens of millions of dollars

he expected to receive at that time when online marketing giant Groupon acquired OrderUp for

nearly $80 million a year later.  As shown below, at all relevant times herein, Jeffery launched

the fraudulent scheme beginning in late 2013 – just when the market for online food delivery

companies such as OrderUp became extremely hot and OrderUp itself was doing very well

financially -- when he found a group of well-connected potential investment partners who shared

with him their plan to purchase their own equity interest in OrderUp in order to market the

company to Groupon.  Rather than share the good news with OrderUp's angel investors that their

investment was about to pay off handsomely, Jeffery never revealed the true identity of his

partners or what their plan was.  Instead, even though the company had just had revenue in 2013

of more than $3 million, making the company worth at least $20 million, Jeffery reported falsely

that competition from GrubHub, Inc., another online food delivery company which in 2013 had

acquired Seamless Web, another online food delivery company, and had just launched a

successful IPO, was threatening the continued viability of OrderUp. Jeffery warned the angels

that if they did not tender their interests right then and there, the company might not be able to

pay them anything at all within a year and if they were holding out hope for an IPO or a merger,

they would have to wait another five to seven years.  In fact, those statements were false and

Jeffery knew they were false when he made them – in order to fraudulently induce the angel

investors to tender their equity interests and simultaneously fraudulently release Jeffery from any

liability for his wrongdoing.  A few months thereafter, in August 2014, his new partners invested

nearly $9 million in the company and in July 2015, they sold the company to Groupon for more

than $78 million.  The angel investors, meanwhile, who were responsible for getting the

company off its feet and on a sound financial footing, got little more than their money back for

the initial risk.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under, among other things, Section 10(b) and

20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t (a), and Rule 10b-5 promulgated

thereunder by the SEC, 17 C.F.R. § 240.10b-5.

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 abnd 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Subject

matter is independently available pursuant to 28 U.S.C. § 1332.

{00061069.DOCX;2}                              2

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(c)(2).

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used he means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone and internet communications.

## PARTIES

6.      Plaintiff Charles Lipson is a citizen and resident of the State of New York. Between 2011 and 2012, he invested a total of $500,000 in OrderUp.  He was the first outside investor in OrderUp and its largest.

7.      Plaintiff Doug Potolsky is a citizen and resident of the State of New York. In 2012, upon the recommendation of plaintiff Lipson, he invested $125,000 in OrderUp.

8.      Plaintiff Samuel Cooper is a citizen and resident of the State of New York.  In 2012, upon the recommendation of plaintiff Lipson, he invested $125,000 in OrderUp.

9.      Plaintiff Steve Israel is a citizen and resident of the State of New York.  In 2012, upon the recommendation of plaintiff Lipson, he invested $100,000 in OrderUp.

10.     Defendant Christopher Jeffery is a citizen and resident of the State of Maryland. He was at all relevant times one of the two founders of OrderUp and its chief executive officer.

11.     Defendant OrderUp, Inc. is a corporation organized and existing under the laws of the State of Delaware and at all relevant times had its principal place of business in Baltimore, MD.  It was incorporated July 15, 2015, and is the legal successor to OrderUp LLC, formerly known as LocalUp Solutions, LLC, a Maryland limited liability company.

## BACKGROUND

12.     Defendant OrderUp is an online food ordering business serving mostly collegiate markets throughout the United States.  It was founded by two undergraduates at Penn State University, one of whom was Jeffery, originally to serve students in and around State College, Pa.  The business, then known as LionMenus, sold online advertising to area restaurants that would post take-out menus on the company's website; whenever students ordered food from the website, the company would process the sale via credit card and retain a percentage of the food sale revenue. The restaurant itself would arrange for delivery.

13.     In 2009, after graduating from Penn State, Jeffery moved the business to Baltimore where he hoped to expand the company's reach to different small and medium sized markets throughout the United States, focusing principally on college towns similar to State College.  The plan was to sell franchises in these new markets, provide the franchisee with software and training, and make money from the sale of the franchise, the training, and a percentage of the local restaurant sales in each market.

14.     In 2010, Jeffery was introduced to Lipson, a Penn State alumnus with an interest in providing financial support to young Penn State graduates looking to start their own businesses.  As part of his pitch, Jeffery explained that the company's success was based on opening up franchises in small to medium sized college towns, and staying away from the cities that other online restaurant businesses were exploiting.  In his promotional brochure, Jeffery said the company's goal is "to be targeted in an M&A transaction within the next 3-5 years" and that "[m]anagement believes a local search conglomerate or media conglomerate would be the ideal candidate for such a transaction."

15.     Thus, in an email to Lipson, dated November 9, 2010, Jeffery stated, "As I've stated before, we do about $20MM in online ordering revenues without raising a single dollar.  Our market penetration is much greater.  Furthermore, we are not focused in the cities they are focusing on" – adding, "Just more evidence that this is a rapidly growing industry.  We need to move soon."

16.     By December 9, 2010, Jeffery was pushing Lipson to invest on the basis of a $4 million valuation – a number Jeffery came up with based on "where the market is today and what other competitors have garnered."  He also promised Lipson a seat on the company's board of directors, quarterly financial statements, annual meetings, and shares of common stock "on the same level" as Jeffery and his partner Kwicien and, referring to Lipson's investment partners, a "first right at a follow-on investment to your group."

17.     In or around April 2011, Lipson agreed to invest $350,000 in OrderUp based on a $3.5 million valuation of the company.  Under the terms of the investment, Lipson received a two-year convertible note that bore interest at 7%.  At any time the note was outstanding, it would convert automatically to equity upon an equity investment with the principal purpose of raising capital that resulted in the company receiving at least $1 million in net proceeds.  Because he invested $350,000 based on a $3.5 million valuation, Lipson had the automatic right upon conversion to receive equity equal to 10% of the company's shares.

18.     There were also optional conversion rights. Thus, if OrderUp either commenced an initial public offering or experienced a change of control as a result of a merger, consolidation, share exchange or company reorganization amounting to $10 million or more, such that more than 51% of the company's existing voting power were to change, the holders of a majority of the outstanding principle of the Notes would have the option either to have their

notes paid off in cash or converted into shares of the Company's common equity at a price per
share equal to the per share consideration to be received by the holders of common shares in
such transaction.

19.     Even though Lipson was promised a board seat, none was offered.

20.     In July 2011, Jeffery sent Lipson an article profiling the company in
techcrunch.com.  The article suggested that OrderUp, then known as LocalUp, because of its
reach in smaller markets around the country, might prove attractive to other companies in the
online restaurant delivery space, such as Grub Hub Inc. and Seamless Web, which were focusing
on large city markets. "While GrubHub offers its services to a number of larger cities (San
Francisco, New York, Chicago, etc.), smaller cities and neighborhoods have not been able to
access a similar platform that caters to their specific locales. Baltimore-based startup LocalUp is
tackling the GrubHub model at a hyper-local level, offering food delivery platforms for small
cities," techcrunch said. "LocalUp lists menus from restaurants that deliver in a given city and
allows diners to order carryout from these platforms. LocalUp actually creates a local, branded
page for each city (i.e. Santa Barbara's LocalUp site is branded as SBmenus.com). The service is
free for diners and restaurants pay commissions on each order processed. Restaurants can also
pay for advertising spots on the page, which place their menus in a more prominent area.
Currently, LocalUp is available in 30 markets, including Columbia, SC; Morgantown, WV;
Gainesville, FL; Buffalo, NY; Boise, ID and Ann Arbor, MI. Since launching last year, the
company has accumulated 500,000 users that have spent a collective $25 million on food
delivery orders to over 700 restaurants. The bootstrapped company expects to grow revenue by
200 percent this year alone. LocalUp differs slightly from GrubHub in that the company actually
will license the white-label food delivery platform to local entrepreneurs, who then run the menu

site. It's sort of like a franchising model. The local entrepreneur is responsible for the day-to-day operations and LocalUp takes a cut from the total food delivery amounts made through the site. Co-founder Christopher Jeffery tells me that this approach has helped the company scale without raising any funding." Techcrunch concluded by stating "[t]ackling the hyper-local market doesn't necessarily ensure success as we know, but LocalUp could be on to something. The company has started to serve coupons and deals alongside the menus, which opens up another revenue stream. And the site could also be an attractive acquisition for GrubHub or Seamless."

21.     In September 2011, Jeffery published a newsletter touting the company and its business model.  "For those of you who don't know, LocalUp Solutions was founded in September of 2009 with the goal of connecting local consumers with local restaurants, online.  Today we see more than 800,000 monthly visitors across our network of hyper-local sites (e.g. HungryBuffs.com) and this number is constantly growing as we dig deeper in current markets and expand horizontally into new hyper-local markets.  We are constantly trying to find different ways to connect local consumers with local restaurants in unique ways, starting with our proprietary software applications connecting these two constituents in one place and ultimately facilitating the local transaction between the consumer and local restaurant through our online ordering engine - processing more than $25MM annually."

22.     In early 2012, Lipson invested an additional $150,000 based this time upon a $5.6 million valuation. In addition, upon his recommendation, plaintiffs Potolsky and Cooper each invested $125,000 and plaintiff Israel invested $100,000. These investments were all in the form of convertible notes that were to mature in three years and bear interest at 7% and, like the note that was issued in 2011, they were automatically convertible to equity – but the terms of such automatic conversion were changed.

23.     Rather than conversion being automatically triggered upon an equity investment with the principal purpose of raising capital that resulted in the company receiving at least $1 million in net proceeds, conversion would instead be automatic only upon an offering of company stock resulting in net proceeds of at least $1 million – and only if the offering is led by one or more "bona fide institutional investors."  In short, conversion would only be automatic in the event OrderUp received at least an additional $1 million through a private placement of its equity – and if only if such investment is led by "bona fide institutional investors."

24.     Because plaintiffs Lipson, Potolsky, Cooper and Israel together contributed a total of $500,000 based upon the $5.6 million valuation, they had an automatic right upon such automatic conversion to receive equity equal to 8.92% of the company's shares. Thus, between what Lipson contributed in 2011 and what he and the other "angel" investors contributed in 2012, they together had conversion rights equal to around 19% of the equity of the company. Conversion would still be optional in the event of an IPO or a change of control that resulted in OrderUp receiving at least $10 million.

25.     Jeffery proposed using the money raised from the additional angel investments in early 2012 to have OrderUp buy out the equity interests of Ynot Advertising, LLC, which owned LionMenus. Jeffery and his partner Jason Kwicien each owned 38.25% of Ynot, and David Laiderman owned 23.5%. The purchase allowed Jeffery and his partner Jason Kwicien to buy out Laiderman, as well as themselves, so that all revenues from LionMenus would then go to OrderUp directly. In addition, to induce Laiderman to go along with the deal, they also agreed to have OrderUp assume Ynot's debt of $440,000.

26.     Jeffery claimed the deal was needed in order to remove Laiderman, whom he saw as an impediment to an M&A transaction for OrderUp because even though Laiderman was

Jeffery's partner in Ynot, a business they both formed together as classmates at Penn State, they had a falling out, resulting in their both simultaneously launching competing business utilizing the same software. Specifically, after Penn State, they both moved to Baltimore as partners in Ynot, but in 2009 Jeffery formed LocalUp Solutions (which later became OrderUp), while Laiderman formed College Advertising Solutions, LLC or CAS, each employing their own proprietary versions of the same software platforms developed by Ynot. Like OrderUp, CAS offered localized online "solutions" for restaurant owners and consumers in the United States.

27.     By using money from Lipson and the other angel investors (as well as additional money borrowed from a third party lender) to acquire Laiderman's interest in Ynot, and then folding Ynot into OrderUp, Jeffery was able to market OrderUp as an M&A target without risk that Laiderman might claim any ownership rights in OrderUp's software.

28.     Jeffery had originally proposed paying himself and Kwicien a combined $1 million for their shares of Ynot, but the investors balked at that. Thus, as consideration for their own ownership interests in Ynot, and to induce the 2012 noteholders to invest, Jeffery and his partner Jason Kwicen each represented in writing, that they would to sell, contribute or otherwise transfer their interests in Ynot for an "an amount not to exceed $300,000."

29.     In fact, consistent with Jeffery's pattern of deceit, when the transaction closed effective July 1, 2012, Jeffery and Kwicien each transferred their own interests in Ynot for $488,000 apiece, which was an increase, not previously approved or disclosed, of 62.66% -- and contrary to what was expressly agreed upon when the investors agreed to contribute their $500,000 in early 2012.

30.     Lipson was not notified of the changed terms until July 17, 2012 – at which point Jeffery disclosed that for purposes of valuing Laiderman's 23.5% interest, Ynot itself had been

valued at $1.276 million, resulting in a payment to Laiderman interest of $300,000. Jeffery then disclosed that both he and Kwicien decided that they should be paid for their own 38.25% equity interests based on the same valuation of $1.276 million used to price the payment to Laiderman, which came to $488,000.

31.　In November 2012, long after the deal had been consummated, Jeffery wrote plaintiffs Lipson and Cooper asking them to "consent" in writing to the terms of the Ynot deal. In asking for their consent, Jeffery represented that Lipson and a company officer at the time, Steve Saporta, who had also invested $150,000 in early 2012, had both orally agreed to the transaction, but that their approval was "never signed off on." Jeffery further represented that "[n]othing has changed materially from the deal Chuck and Steve agreed to on behalf of the investors back in July, other than other than needing signatures rather than verbal/email confirmation."

32.　In fact, Jeffery had never asked for nor obtained any such approvals, either verbally or via email. Nor had he disclosed to plaintiff Lipson, prior to signing the deal, that the consideration he and Kwicien had received had increased 62.66% over what had been represented to the investors, in writing, in early 2012, in order to induce them to invest. Lipson nevertheless signed off on the change, despite Jeffery's misrepresentations, because it was presented as a fait accompli, it could not be undone, and the overall transaction was important for cleaning up the relationship with Laiderman so that OrderUp could be a viable M&A target for acquisition.

33.　In 2013, Jeffery continued to promote the company to investors while the market for online restaurant delivery services continued to grow – along with OrderUp's business.

34.    In May 2013, GrubHub and Seamless announced that they were merging, and the merger closed in early August 2013.

35.    On June 4, 2013, Jeffery notified Lipson that the two-year maturity date on the convertible notes he had from 2011 had passed, that Lipson had a right to demand payment thereon, plus interest at 7%, but that if Lipson exercised his right to receive payment, the company would not have the funds on hand to pay and would therefore have to file bankruptcy. Accordingly, Jeffery asked Lipson to extend the maturity date until the February 2015 maturity dates on the notes issued in early 2012, which Lipson agreed to do.

36.    On information and belief, in or around November 2013, Jeffery met with Chris Brandenburg, who had been co-founder and chief technology officer of Millennial Media, Inc., a Baltimore based Internet advertising company specializing in the sale of display ads for mobile devices. The purpose of their meeting was to explore a potential investment in OrderUp by Brandenburg himself.  Millennial went public in March 2012 and Brandenburg's stock holding at the time was valued at around $150 million. In April 2013, Brandenburg resigned from Millennial, but stayed in Baltimore to invest in startups.  One of the companies he invested in was a Baltimore startup "Flying Pig Digital, LLC," formed in 2012, which does business under the name "NewsUp."  NewsUp markets online quizzes aimed at millennials.  In 2013, Brandenburg became a member of NewsUp's board of directors.

37.    On information and belief, Brandenburg offered to introduce Jeffery to individuals he knew from LivingSocial Inc. who he believed would have an interest in acquiring OrderUp not for LivingSocial itself, but rather for LivingSocial's chief competitor, Groupon. These individuals included Tim O'Shaughnessy, Paul Barry, and Tige Savage, all of whom were based in the Washington, D.C. area.  O'Shaughnessy was the president of LivingSocial.com,

Barry was a technical engineer at LivingSocial and Savage was a member of the board of directors of LivingSocial and a partner in Revolution LLC, a venture capital firm founded by Steve Case, the co-founder and former CEO of America Online.

38.     LivingSocial was at all relevant times an online marketplace that was best known for offering daily deals to subscribers in the form of coupons offering discounts on restaurants, hotels, vacation packages, products and services.  The company was founded in 2007 by four employees from Revolution Health Group, which was owned by Revolution LLC. LivingSocial launched its daily deals website in 2009 and through a series of acquisitions of similar sites around the world, became a global leader in that market.  Its chief competitor was Groupon, Inc., which operated a similar business.

39.     However, by 2013, the daily deals business began leveling off and both LivingSocial and Groupon were under pressure to refocus their business strategy. O'Shaughnessy believed at the time that LivingSocial's future was in online advertising, while Groupon's future, he believed, was in the delivery of physical goods and services.

40.     O'Shaughnessy and Savage were at that time already familiar with Groupon and its strategic plans.  Among other things, in November 2013, LivingSocial sold Ticket Monster, Inc., one of Korea's leading e-commerce companies, to Groupon for $260 million in cash and 13.8 million shares of Groupon, or about 2% of Groupon's total outstanding shares.

41.     On information and belief, based on the meeting or meetings that took place between Jeffery, Brandenburg and the aforementioned individuals from LivingSocial, an agreement was then reached on a plan for them to acquire OrderUp for an eventual sale to Groupon.  Jeffery himself was introduced at or around that time to Jason Harinstein, a senior vice president for corporate development at Groupon.

42.     Recognizing that OrderUp would soon be in the hands of individuals with the financial wherewithal and connections to structure a sale to Groupon, Jeffery realized that to maximize his own personal gain he would have to find a way to get rid of OrderUp's angel investors.

43.     Accordingly, on November 7, 2013, Jeffery emailed Lipson to find out whether the angel investors would be interested in an early buy-out of their interests and if so, how much they would take. Without disclosing the substance of his discussions with Brandenburg and LivingSocial personnel to acquire a piece of the company for an eventual sale to Groupon, Jeffery said, "Do you think these guys would want to be in for another 5 years? I'm more inclined to give you a decent return on your first round now and leave the next round into convert, but I'm not sure they'd want to do that. If I were able to get say a 40-50% return on their money to get out (the second round), do you think it would make sense from their/your end (not speaking your first round, just talking the 2nd round). Let me know your thoughts. I'm really just curious that if I don't feel like we can do 60-80% return on the second round (more like 40-50), would they stay in and convert or take the 40-50?"

44.     Lipson responded that same day suggesting that the company market itself to Seamless. In an email to Jeffery, Lipson said, "[m]aybe we should approach Seamless and sell the company and see what we can get. Seems like we should be able to get 3X revs in any acquisition or get Seamless stock and then wait for the Hot IPO market which certainly would value the combined company at way more than 3X revs. Just my preliminary thoughts to what seems like a low ball offer, after all the money was put in when the company was in far worse shape than it is now." Jeffery emailed back asking, "What multiple do you think GrubHub Seamless would get? Think they are preparing to go public in first or second quarter of

'14. That's word on the street." In fact, unbeknownst to Lipson, Jeffery was already working on

a plan with former executives of LivingSocial to acquire the company and sell it instead to

Groupon.

45.     On November 8, 2013, Jeffery sent Lipson a published report that GrubHub

Seamless, having now merged, was planning to launch an IPO, with an anticipated post-IPO

market capitalization of between $3 billion and $5 billion.  Lipson immediately suggested again

that Jeffery offer OrderUp to the merged company, in exchange for shares or cash, so that the

merged company could take advantage of the opportunity to acquire an even larger business

before the IPO was launched. As Lipson said, "[a]t a 20-times revenue multiple, the company's

post-IPO market cap could be between $3 billion and $5 billion.  Sounds like we should sell to

Seamless, take stock at say 10X revenues [$35 million valuation] and then wait for it to go

public.  Sounds ridiculous for me to sell out at 3X revs, might as well take a shot and go for the

home run."  He added, "Let Seamless build the business, they want scale." Jeffery responded that

GrubHub's executives had already emailed him to set up a call to discuss the matter.

46.     On information and belief, at or around November and December 2013, Jeffery

discussed the possibility with GrubHub of an acquisition of OrderUp but, because he had already

agreed with other prospective investors on a plan to sell the company to Groupon, Jeffery used

those discussions mainly to find out how much GrubHub would be willing to pay.  In those

conversations, GrubHub suggested that Jeffery's financial expectations for an acquisition by

GrubHub were unrealistic because OrderUp's business model was based on building its business

in small to medium sized markets using franchisees.  As shown below, Jeffery later took that

argument out of context to explain to the angel investors why OrderUp would not be acquired by

GrubHub or anyone else for at least another five years when he was planning all along to do a deal with Groupon.

47.     On December 21, 2013, Jeffery told Lipson to start working on a deal in which those who invested $500,000 in early 2012 would give up their equity for $1.15 million, which Jeffery characterized as a 70% return on investment. In addition, Jeffery told Lipson he would have to exchange one half of the 10% equity interest he received in 2011 for $350,000 plus the 7% interest he would have earned to date. Jeffery said the total transaction would cost the company $1.5 million and still leave Lipson with "a significant stake in OrderUp."

48.     On December 22, 2013, Lipson told Jeffery the proposed terms were unacceptable, noting that, as an angel investor he invested when OrderUp was "a struggling company needing guidance, money and a lot of cleaning up of the messy legal and complicated financial structure," that today OrderUp is in "far better financial shape," that "[w]e are about to enter a year when you will probably do almost $5 million and have just completed a year when you did $3.5 million or so," and "[w]e are being asked to accept a valuation far lower than that we bought into." Lipson also noted that he had "asked to be on the Board and this has also gone nowhere." Lipson added, "I can only think that you would much prefer to proceed with new investors, but first you must deal with the old investors."

49.     On or around January 10, 2014, O'Shaughnessy announced that he was resigning as president of LivingSocial and two weeks later, on January 23, 2014, Jeffery hired Paul Barry, the LivingSocial technical engineer, to be OrderUp's new chief technology officer.

50.     Also on January 23, 2014, Jeffery held a financing briefing for Lipson and the other angel investors. He reported that the company had revenues for 2013 of nearly $3.5 million and net operating income for 2013 of around $300,000. Although Jeffery did not

disclose it, revenues of nearly $3.5 million meant that the company was worth at least $20 million, and given the rapid growth that the company had been experiencing, it was probably worth considerably more than that.

51.     Jeffery also reported that the company had opened new markets in Southern California, Phoenix, Naperville, Columbus, Norman, Oklahoma; that the tech sector had been "investing big lately," that competition was "strong and getting stronger, both at the national and local level, that the company needed to expand faster and expand on its own into new geographic markets, and that "if we don't move fast enough, we'll end up losing market share, both horizontally and vertically."

52.     All that Jeffery disclosed at that time to Lipson and the other angel investors about his dealings with LivingSocial and Brandenburg was that OrderUp had just hired a "former principal at LivingSocial" as the company's new chief technology officer.

53.     While Jeffery knew he had to find a way to rid himself of his angel investors, the investors themselves were meanwhile digging in their heels expecting that, because the market for the online restaurant business had become so hot, if GrubHub itself did not acquire OrderUp, another company soon would.

54.     On February 20, 2014, GrubHub announced that it would soon be commencing an initial public offering.  Lipson wrote Jeffery to suggest that "if the valuation is high enough, maybe we should go public at year end with a small underwriter."  A month later, when the IPO was successfully launched, Jeffery dismissed Lipson's suggestion as "simply not possible given our current revenue levels (sub $5M)."  In fact, as Jeffery was already planning a two-stage transaction to sell the company to Groupon for what he expected would be millions of dollars.

55.     On March 27, 2014, Jeffery informed Lipson and the other angel investors of his

plan to extinguish their equity interests. In an email to the group, Jeffery falsely represented that

OrderUp was in trouble financially, that the GrubHub IPO was not good news but bad news, that

no company would be interested in acquiring OrderUp for at least another five to seven years,

and that unless the investors agreed right then and there to tender their convertible notes for a

modest 10% premium over what they had invested, the company would probably not have any

money to pay them anything when the notes matured a year later.  These representations were

all false and Jeffery knew they were false when he made them.

56.     Specifically, Jeffery represented that the GrubHub IPO was "bad news" for

OrderUp because "potential institutional investors for OrderUp are concerned that GrubHub has

a massive lead on the other players in the market, including OrderUp." In fact, no potential

institutional investors for OrderUp had said that to Jeffery.

57.     Jeffery also represented that "[w]e spoke to GrubHub late last year regarding a

possible acquisition of OrderUp, and they were not interested due to our unique distribution

model (franchise + license agreements). The franchise model was significantly different than

their business model and they did not see a fit." In fact, GrubHub had expressed interest to

Jeffery last November in acquiring OrderUp – GrubHub itself had initiated the contact – far from

not seeing a fit, GrubHub felt that OrderUp's focus on small and medium sized markets fit nicely

with GrubHub's focus on markets in major cities. And the comments about OrderUp's "unique

distribution model" were made not to suggest the absence of a fit, but rather to show Jeffery that

he was asking too high a price.

58.     Jeffery then represented that "[o]ver the past 90 days, we went out to see what the

investment community would yield in terms of an investment opportunity in OrderUp. Multiple

times we were told that the space is just too crowded and GrubHub is the clear leader, and that GrubHub will start going more and more downstream (which we're starting to see). In fact, the only communications that Jeffery had with the "investment community" during the preceding 90-days were with Brandenburg, O'Shaughnessy, and Savage, and far from telling him that the space was too crowded, they were the ones who, with Jeffery, agreed on a plan to invest in OrderUp in anticipation of a sale to Groupon.

59.    Jeffery further stated that, "[r]ecently, we connected with certain individuals who-co-founded and took public a local Baltimore company, Millenial Media." In fact, the only such individual was Brandenburg. He further represented that, "[a]fter talking about [OrderUp] and our challenges at the moment, these investors appear interested in trying to help us 'right the ship' through a new investment by them of approximately $1M-$1.5M, as individuals, and an improved business strategy with the help of their strategic advice." In fact, Jeffery knew, but did not disclose, that the investors were Brandenburg, O'Shaughnessy, and Savage, that they planned to invest substantially more than that, and that their strategic advice was to stage the company for an eventual sale to Groupon.

60.    Jeffery then represented that "[a]ccordingly, we have decided to move forward with their investment, and we'll increase the size of their convertible bridge to up to $3M. Please note that this won't trigger a conversion of the 2012 notes, as it is an individual who is leading (not an institutional investor) and it is debt financing (not equity)." In fact, these were not the terms of any deal Jeffery had been offered, but rather were terms Jeffery made up in order to persuade Lipson and the angel investors that it was the new investors – not Jeffery – who were looking to prevent them from being able to convert their notes into equity anytime soon.

61.     Jeffery then gave the investors a "take it or leave it" deal, stating, "[w]ith this said, we believe it would be fair to see if we can reach an agreement to buy out the 2012 notes as part of this deal before the maturity date of your notes, Feb. 3, 2015.  You have been patient investors and I'm sure we have disappointed you with our performance to date.  In addition, it is best for [OrderUp] to reduce our amount of debt given our small size, and to liquidate investors who are likely not excited to wait another 5-7 years for liquidity. We have worked hard with the proposed new investors to craft an offer for each party." In fact, Jeffery had not "worked hard" with the proposed new investors to do anything of the sort.  He was instead looking solely to squeeze out the angel investors so that, when the Groupon deal was finally consummated, the angel investors would not be entitled to exercise conversion rights that would give them almost 20% of the equity in OrderUp and thus the right to recover almost 20% of the proceeds of the deal.

62.     Jeffery next represented that "[w]ith this new investment, we hope to 'hit reset,' hire some additional development talent (as we need better and differentiated technology in the space), and such investment should hopefully last through the next 24 months, taking us through the maturity date of the 2012 notes."  In fact, as indicated, the purpose of the new investment was not to "hit reset" at all but to stage the company for an eventual sale to Groupon well within that 24-month window.

63.     Jeffery further stated that, "[d]uring our discussions with the proposed new individuals [sic], I explained that I wanted to give the 2012 note holders the option to get out today, at some premium. We decided this premium would be 10%, which would yield a 23% ROI and a close to 6% IRR [internal rate of return] after you factor in the interest we've been paying." In fact, the proposed terms were not the result of discussions with the proposed new

investors, but were instead the product of Jeffery's own desire to buy out the angel investors at the cheapest price he thought he could get away with paying.

64.     Jeffery went on to say that this "is the best offer that the proposed new investors are willing to allow us to do," that "[t]ime is the enemy of all deals, and I'm nervous that the proposed new investors will lose their interet in the company if we wait too long," and that "the alternative to accepting this option today, is to wait until February 3, 2015 and call the note at that time, without the 10% premium, or wait for the optional conversion which converts at par on an IPO, merger or change of control" and "[o]bviously the risk here is that we're in a worse position in 12 months, and unable to pay if called." In fact, this was not the best offer that the proposed new investors were willing to allow Jeffery to do because these were terms that Jeffery himself came up with on his own in order to squeeze out the angel investors.

65.     Lipson responded on behalf of himself and the other angel investors with shock, and wrote Jeffery stating, "Obviously I was disappointed to learn yesterday that OrderUp was having such difficulties that in a way I was lucky to get paid out at a 10% premium. After a positive conference call little over a month ago, this sudden dire forecast came as a "bolt out of the blue". It was especially shocking to learn that my original investment, made at a much lower valuation, was lucky to even get the 10% premium."

66.     Lipson also wondered at the time whether Jeffery was telling the truth and told Jeffery that he wondered should OrderUp be successful "if we got shaken out of something needlessly." He told Jeffery that given all of the sacrifices that he had made on Jeffery's behalf, including putting up cash when no one else was willing to do so, he felt that just when it appeared the company was doing well financially, with projections of $4.5-$5 million in revenues, and just when the market for such companies appeared to be very hot, as illustrated by

{00061069.DOCX;2}                                    20

the GrubHub IPO, " I never expected for things to deteriorate so suddenly," thinking "we had a

valuable property, definitely not one that I was fortunate to get my money back." Lipson then

asked whether Jeffery would consider giving the angel investors five-year warrants as a "going

away present" to "alleviate that feeling [of being shaken down] or at least give us some

recognition for having given you the funds to get this far in your game plan. It would allow us to

participate in your "hopeful" success. Maybe they could even be against your ownership

position if the new investor is truly adamant against it."

67.     Jeffery refused to budge, insisting that "Jason and I are at a point where we can't

give up anything against our personal ownership stake unfortunately. The best option today, is

the 10% premium the investor is willing to pay out or we will just use that money to put into the

business if you opted to wait it out." In fact, Jeffery knew the best option for the investors was

not to cash out but to hold on to their notes because he knew Brandenburg, Savage and

O'Shaughnessy were about to make an investment to stage the company for an eventual sale to

Groupon which, when that happened, would have resulted in the investors getting millions of

dollars for their 20% equity interest in OrderUp which Jeffery did not want them to have.

68.     Faced with a CEO they knew was duty bound to tell the truth but whom they did

not trust, the terms of a proposed investment they were not shown, and the risk that, if Jeffery

were in fact telling the truth, there was a good chance within a year's time that the angel

investors would lose the value of their investment entirely, they agreed to accept Jeffery's terms.

69.     Had the investors known the true facts, which Jeffery deliberately concealed from

them, they would never have tendered their notes.

70.     However, Jeffery was not done with them. Knowing that he had defrauded the

angel investors into giving up their equity interests in OrderUp just as the company was on the

verge of being sold for millions of dollars to Groupon, Jeffery needed to engage in one more act of fraud: he needed to get the angel investors to give him a complete release as a condition for getting back their money.

71.    Thus, on April 17, 2014, Jeffery transmitted to Lipson and the other angel investors a Note Payoff Letter which purported to include a "settlement of all claims of the [investor] against OrderUp, LLC, together with "the Company's past, present and future affiliates, predecessors, successors, assigns, direct and indirect equity owners, directors, officers and employees, the Released Parties." The payoff letter went on to state that each investor "unconditionally and irrevocably released, waived and forever discharged any and claims of any nature, character, or kind whatsoever that the Creditor has or may have against the Released Parties." In addition, with full knowledge by Jeffery of what he had done, and the likelihood that the investors would figure it out sooner or later, the letter stated that each investor "hereby acknowledges that it may hereafter discover claims or facts in addition to, or different from, those which it now knows or believes to exist, but that it expressly agrees to fully, finally and forever settle and release any and all claims, known or unknown, suspected or unsuspected, which exist of may exist on its behalf against the Released Parties at the time the [investor] receives the Settlement Payment.

72.    In fact, had plaintiffs known the true facts that Jeffery purposely concealed from them, they would never have tendered their notes and certainly would never have executed the aforementioned release as a condition of payment.

73.    On June 25, 2014, Lipson wrote Jeffery: "[a]fter much reflection, I have come to realize you were one of the most deceptive businessmen that I have met in over 40 years in business – and I have met many sleazy people. After all that I did for you, to be treated like you

treated me and then my investors, is disgusting. You do what you have to do in life, but few have taken a lower road than you. Almost three years of nurturing your business and being there when there was no one else, has been rewarded with 'someone better has come along and we need to get you out at all cost.' You will have to live with yourself but either we were lied to all along or lied to at the end – either way it reflects horribly on your ethics as a business person and as a human being. I could have played tough businessman and lawyered up, etc. but playing ball with someone you distrust is not what I want to do at this point. Thus we sold on your 'GrubHub has raised hundreds of millions, is killing us in some markets already, and we could go bankrupt' statement. Probably none of it was true, but you would say anything to get us out. The fact that you have ignored me since the deal was struck only confirms your intentions. Use someone then dump them. It will come back to haunt you. I will not soon forget the treatment leveled on me and will forever remember you and the experience with contempt."

74.     Jeffery did not deny what Lipson said. On June 26, 2014, he responded saying, "I don't think you fully understood and understand my position on this matter."

75.     Once the notes had been redeemed, Jeffery's plan for OrderUp began to take shape.

76.     On or about August 14, 2014, Revolution Ventures announced that it and LivingSocial cofounder O'Shaughnessy led a $7 million round of "Series A funding" for OrderUp. Under the terms of the deal, OrderUp was converted from a limited liability company to a Delaware corporation and Tige Savage and Chris Brandenburg each became members of OrderUp's newly formed board of directors. The stated purpose for the infusion of money was to allow OrderUp to open marketing and development offices in New York and Boulder, Colo. as the company ramps up plans to expand into additional cities. In fact, in accordance with the plan

set in motion as far back as November 2013, the infusion of money was to stage the company for its eventual sale to Groupon.

77.     Shortly after the $7 million investment became public, OrderUp hired Michael Smith to be "vice president for corporate development." Smith had been AOL's senior vice president for corporate development for the past nine years. Upon information and belief, Smith hired to lead OrderUp's negotiations with Groupon.

78.     On July 16, 2015 Groupon acquired all of the outstanding equity interests of OrderUp, Inc. The aggregate consideration for the acquisition totaled $78.6 million, consisting of $69.024 million in cash and an additional $9.605 million as contingent consideration.

## THE SAFE HARBOR

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker, Jeffery, knew that the particular forward-looking statement was false.

## COUNT I

### Violation of Section 10(b) of

### The Exchange Act and Rule 10b-5

### Against Both Defendants

80.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

81.     Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to: (i) deceive plaintiffs as alleged herein; and (ii) cause plaintiffs to tender their valuable convertible notes for relatively nominal consideration when they otherwise would have held on to them.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

82.     The convertible notes are securities, as defined in Section 3(a)(9) of the Exchange Act, 15 U.S.C. § 78c(a).

83.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs in an effort to induce them to redeem their convertible notes for far less than what they were worth in violation of Section 10(b) of the Exchange Ac and Rule 10b-5. The defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

84.     Defendants Jeffery and OrderUp, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal material information about the business, operations, and future prospects of OrderUp, as specified herein.

85.     These defendants employed devices, schemes and artifices to defraud, while in possession of material non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to induce plaintiffs to redeem their convertible notes for less than fair value, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about OrderUp and its business operations and future prospects in the light of the circumstances under which they were made, no misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon plaintiffs.

86.     Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Jeffery was the chief executive officer at OrderUp; (ii) Jeffery was privy to and participated in discussions with certain prospective investors who planned to acquire OrderUp for the purpose of staging its eventual sale to Groupon; and (iii) Jeffery participated in OrderUp's dissemination of information to plaintiffs which he knew was materially false and misleading.

87.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly, or recklessly and for the purpose and effect of concealing the true facts as to OrderUp's true value.

88.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the value of the convertible notes was artificially deflated.  In ignorance of the fact that the statements and omissions of defendants were materially false and misleading, plaintiffs redeemed their convertible notes and were damaged thereby.

89.     At the time of said misrepresentations and omissions, plaintiffs were ignorant of their falsity, and believed them to be true.  Had plaintiffs known the truth, which was not disclosed by defendants, plaintiffs would not have redeemed their convertible notes.

90.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered damages in connection with their investment in the convertible notes.

## COUNT II

### Violation of Section 20(a) of the Exchange Act against Defendant Jeffery

92.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

93.     Jeffery acted as a controlling person of OrderUp within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position as company CEO, he had the power to influence and control and did influence and control, directly or indirectly, the decision-making of OrderUp, including the content and dissemination of the various statements which plaintiffs contend were false and misleading.  Jeffery had unlimited access to OrderUp's business records and information and direct involvement in the day-to-day operations of OrderUp.

94.     As set forth above, defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Jeffery is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Jeffery's wrongful conduct, plaintiffs suffered damages in connection with their having redeemed their convertible notes.

## COUNT III

### Common Law Fraud against Both Defendants

95.     Plaintiffs repeat and reallege each and every allegation contained above.

96.     This claim is brought by plaintiffs against both defendants based upon common law principles of fraud.

97.     Each of the defendants owed to plaintiffs a duty of full disclosure, honesty and complete candor, as well as a duty to exercise reasonable care and to make a reasonable and diligent investigation of the statements provided to plaintiffs, including the statements identified above.

98.     For the purpose of inducing plaintiffs to redeem their convertible notes, and with knowledge, the intent to deceive, or reckless indifference to plaintiffs, defendants employed a scheme and conspiracy to defraud as part of which defendants made, or participated in the making of material misrepresentations of fact to plaintiffs, and as a further part of which defendants concealed the true facts, and being bound to disclose, omitted to state material facts as set forth above.  Those representations and statements were not true and defendants did not believe them to be true.  Said acts by defendants were fraudulent, oppressive and malicious.

99.     Plaintiffs, at the time of said representations and omissions, were ignorant of the falsity of defendants' representations, and believed them to be true.  In reliance, directly and

{00061069.DOCX;2}                    28

indirectly, upon said misrepresentations, and the fidelity, integrity, and superior knowledge of defendants, and in ignorance of the true facts, plaintiffs were induced to and did enter into agreements to redeem their convertible notes. Had plaintiffs known the true facts, they would not have taken such action. By reason thereof, plaintiffs have been damaged.

WHEREFORE, plaintiffs demand relief and judgment as follows:

(a)     For compensatory damages and interest in an amount to be determined at trial, plus costs, expenses and disbursements including reasonable attorneys' fees;

(b)     Declaratory judgment finding that the release of claims that defendants required as a condition for agreeing to redeem the convertible notes was procured by fraud and is therefore void and unenforceable;

(c)     Consequential damages in an amount to be determined at trial; and

(d)     Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        May 23, 2016

EATON & VAN WINKLE LLP

By:  _____
     Robert B. Bernstein, Esq. RB-1934

3 Park Avenue, 16th Floor
New York, New York 10016
(646) 485-5334
rbernstein@evw.com
*Attorneys for Plaintiffs*