USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-28-17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES LIPSON, DOUG POTOLSKY, SAMUEL COOPER and STEVE ISRAEL,

Plaintiffs,

v.

ORDERUP, INC. and CHRISTOPHER J. JEFFERY,

Defendants.

16-cv-3833 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, District Judge:

Charles Lipson, Doug Potolsky, Samuel Cooper, and Steve Israel (collectively, "Plaintiffs") bring this securities fraud action against OrderUp, Inc. ("OrderUp") and Christopher Jeffery (collectively, "Defendants"). Plaintiffs assert claims of fraudulent misrepresentations under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"), and Section 20(a) of the Exchange Act. Compl. ¶¶ 80−91, 92−94. Plaintiffs also plead common law fraud against both Defendants. *Id.* ¶¶ 95–99.

Defendants move dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, citing an enforceable release between parties, a lack of reliance, an absence of an actionable misrepresentation or damages, and seeking attorneys' fees. For the reasons stated below, because the release that the parties agreed to is enforceable, and accordingly bars the claims alleged in the Complaint, Defendants' motion is GRANTED in its entirety.

**I. BACKGROUND**

Plaintiffs are a group of early investors in Defendant OrderUp, an online restaurant ordering and delivery service. Compl. ¶ 1. Defendant Chris Jeffery and his Penn State classmate founded OrderUp to serve students in the College State region, before the company expanded to new collegiate markets across the country. *Id.* ¶¶ 12–13. Jeffery moved the business to Baltimore in 2009, in order to work on its expansion, where he was later introduced to Plaintiff Lipson, a Penn State alumnus interested in supporting Jeffery's burgeoning business. *Id.* ¶¶ 13–14. Lipson invested $350,000 in the company in April of 2011. *Id.* ¶ 17. In turn, Lipson received a series of convertible notes, with the right to receive annual interest. *Id.* Lipson also had the right to convert his investment to equity equal to 10% if the company were to receive a venture capital investment of sufficient value within two years.[1] Additionally, if OrderUp were to change control or merge with another company, Lipson had the right to be paid out in cash, or convert his shares. *Id.* ¶ 18.

In early 2012, Lipson invested another $150,000 into OrderUp. *Id.* ¶ 22. Upon Lipson's recommendation, Plaintiffs Cooper, Potolsky, and Israel invested a collective $350,000, for a total new investment of $500,000. *Id.* All of these investments were also made in exchange for convertible notes, with a 10% premium in the event of an acquisition. MTD at 3. The convertible notes Lipson received in 2011 were set to mature in 2013, which he later extended to mature in February of 2015, and those received in 2012 were also set to mature in February of 2015.

Jeffery's promotional brochure stated that the company's goal was to be acquired by a conglomerate within three to five years. *Id.* ¶ 14.

---

[1] The text of the convertible notes states that if the company were to be bought outright, Lipson would receive only the face value of his investment plus any accrued interest. Defs.' Mot. to Dismiss at 3 (Doc. 15) ["MTD"].

*A. March 2014 Email*

Jeffery sent OrderUp's investors an email on March 27, 2014, informing them of his wish to move forward with various new investors who promised to strategically revamp OrderUp's business. In order to do so, Jeffery needed to reach an agreement to buy out the notes that were set to mature in February of 2015. Doc. 16-7 at 1–2, Ex. G to MTD.

The Complaint details various incidents leading up to the March 27, 2014 email, including Jeffery's meetings with potential investors, Compl. ¶¶ 36–37, 41, OrderUp's inability to go public or merge with a more successful restaurant delivery company, *id.* ¶¶ 44–46, 53, and the challenges that the merger of GrubHub and Seamless posed to OrderUp's ability to be an acquisition target. *Id.* ¶¶ 45–46. Specifically, the Complaint alleges that Jeffery met with various professionals with connections to LivingSocial Inc., an online company that offered daily coupon deals for restaurants, hotels, and products and services. *Id.* ¶¶ 37–38. Plaintiffs allege that Jeffery failed to disclose these connections—which would ultimately land OrderUp in the hands of Groupon, LivingSocial's primary competitor—when he approached Lipson about commencing an early buy-out of the investor's interests, and when he ultimately informed investors that he would be buying out their convertible notes. *Id.* ¶¶ 1, 43, 46, 59.

In February of 2014, shortly before Jeffery's March 27, 2014 email, GrubHub issued an initial public offering ("IPO"). *Id.* ¶ 54. Jeffery's email begins by describing the implications of GrubHub's IPO for OrderUp. The good news, he states, is that the IPO "validated the industry as a successful marketplace," although GrubHub's success might prove it to be a formidable competitor. Doc. 16-7 at 1. Jeffery notes the company's recent business impediments: GrubHub previously declined to acquire OrderUp, due to OrderUp's unique business model of using local franchises to expand to various regional markets. *Id.* The email also states that Lipson's idea for

OrderUp to follow GrubHub and go public was not possible, given OrderUp's revenue of under $5 million. *Id.*; *see also* Compl. ¶ 54.

In order to "hit[] the 'reset' button" with Jeffery's new investors, Jeffery wanted to buy out the original investors' 2012 notes at a premium of 10%, in advance of the maturity date in February of 2015. Doc. 16-7 at 2. The investors had three options: (1) have their notes bought out for their value with a 10% premium; (2) wait until February 2015 to be paid on the note's date of maturity, without the premium; or (3) wait for the option to convert their notes to equity in the event of an IPO, merger, or change of control, without the premium. *Id.* The second option bore the risk that the company would be unable to pay on the note, and the third option bore the risk that such a conversion option might never eventuate. Jeffery noted his worry that investors would lose interest if Plaintiffs delayed on agreeing to the note payout. *Id.*

Lipson reached out to Jeffery on behalf of Plaintiffs, expressing surprise and disappointment at the company's forecast, and requesting a five-year warrant in the event OrderUp became successful one day. Compl. ¶¶ 65-66. Jeffery refused. *Id.* ¶ 67. The Complaint states that the investors doubted that Jeffery was telling the truth. *Id.* ¶ 68. Afraid of losing the value of their investments, Plaintiffs tendered their notes, and in doing so agreed to be bought out for their investments plus the 10% premium. *Id.*

In August of 2014, the venture capital firm Revolution Ventures and former LivingSocial president Tim O'Shaughnessy invested $7 million into OrderUp. *Id.* ¶ 76. Nearly a year later, on July 16, 2015, Groupon bought OrderUp for $78.6 million. *Id.* ¶ 78.

Plaintiffs allege that Defendants misrepresented OrderUp's acquisition prospects, in order to maximize Jeffery's share in the eventual sale to Groupon. *Id.* ¶¶ 1, 42. Plaintiffs now sue Defendants for carrying out an unlawful scheme to deceive Plaintiffs and cause them to tender

their notes for nominal consideration. *Id.* ¶¶ 1, 81, 98. They allege that Defendants made material misrepresentations or concealed facts that they were duty bound to disclose to Plaintiffs. *Id.* ¶¶ 52, 59, 87. Had Plaintiffs known of OrderUp's potential, given the dealings with individuals connected to LivingSocial, Plaintiffs claim, they would never have tendered their notes. *Id.*¶ 69.

**II. ARGUMENT**

For the purposes of this motion, this Court accepts as true all well-pleaded factual allegations, while drawing all reasonable inferences in favor of the non-moving party. *See Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016). To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, the court must decide whether plaintiffs allege enough to plausibly give rise to an inference of unlawful conduct, and are thereby entitled to relief. *Iqbal*, 556 U.S. at 678.

*A. Plaintiffs' Claims Are Barred by the Release*

When Plaintiffs agreed to tender their notes, they signed Note Payoff letters releasing Defendants from any and all future claims related to this transaction. *E.g.*, Docs. 16-8−16-11, Exs. H, I, J, K to MTD. Because this clause (the "Release" or "Releases") is unambiguous and contains a valid discharge of all claims arising out of Plaintiffs' investment in OrderUp, the Release bars Plaintiffs' Complaint. *Morefun Co. v. Mario Badescu Skin Care Inc.*, 2014 WL 2560608, at *3 (S.D.N.Y. June 6, 2014) (Schofield, J.), *aff'd*, 588 F. App'x 54 (2d Cir. 2014).

Dismissal of a Complaint under Rule 12(b)(6) due to a valid release is permitted where a defendant raises the release as an affirmative defense, and "it is clear from the face of the

complaint and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis omitted).

Releases, like settlement agreements, are ordinary contracts to be interpreted according to general principles of contract law. *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 (2d Cir. 2001). New York law gives full effect to parties' choice-of-law provisions, *see Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996), and the Releases unambiguously state parties' choice to be governed by the laws of Maryland. Doc 16-8, Ex. H to MTD.[2]

The Court of Appeals of Maryland has articulated three principles in guiding the interpretation of contractual releases. First, absent constitutional or statutory barriers, parties retain the privilege to bargain for an agreement and "thus designate the extent of the peace being purchased." *Bernstein v. Kapneck*, 290 Md. 452, 459 (1981). Second, the settlement of disputes outside of court is encouraged, and an appropriately signed release will be respected as a binding contract. "[A] release evidencing accord and satisfaction is a jural act of exhalted significance which without binding durability would render the compromise of disputes superfluous . . . ." *Id.* Finally, when the agreement is stated in clear and unambiguous terms, the contract will be interpreted according to its plain meaning. *Id.*

The Release clause in the Note Payoff letters is as follows:

> Effective upon the Creditor's receipt of the Settlement Payment, the Creditor unconditionally and irrevocably RELEASES, WAIVES and FOREVER DISCHARGES any and all claims of any nature, character or kind whatsoever that the Creditor has or may have against the Released Parties. The Creditor acknowledges that the benefit of this release inures to all Released Parties, who are entitled to rely on this release for all purposes.…

[2] The Release states, "The laws of the State of Maryland, without regard to conflicts of laws principles, shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties hereto."

> In connection with such waiver and relinquishment, the Creditor hereby acknowledges that it may hereafter discover claims or facts in addition to, or different from, those which it now knows or believes to exist, but that it expressly agrees to fully, finally and forever settle and release any and all claims, known or unknown, suspected or unsuspected, which exist or may exist on its behalf against the Released Parties at the time the Creditor receives the Settlement Payment.

Doc. 16-8 at 1–2. The text unambiguously releases parties of all claims, without restriction; this applies to unknown claims of fraud, as well.

The Maryland Court of Appeals in *Bernstein* expressed a preference for upholding broad releases, including unforeseen and unanticipated claims, and declined to grant an exception to this rule. *See Marcus v. Rapid Advance, LLC*, 2013 WL 2458347, at *7 (E.D. Pa. June 7, 2013) (citing *Bernstein*, 290 Md. at 456, and quoting *Herget v. Herget*, 319 Md. 466, 473 (1990) ("We reject the notion that the parties in the case before us were incapable of releasing a right that did not then exist.")).

*B. The Release Was Fairly and Knowingly Signed*

Plaintiffs acknowledge that courts have upheld valid releases to cover unknown claims of fraud. Pls.' Opp'n to Mot. to Dismiss at 7 (Doc. 19) ["Opp'n]. However, they contend that these precedents are inapplicable, because the agreement was not fairly and knowingly made, which thus invalidates the contract. *Id*. at 4. Plaintiffs argue that the Release was signed without the advice of counsel, without disclaimers subjecting the Release to discovery of additional facts, and without an integration clause, and was thus neither fair nor knowing. *Id.* at 7–8. This argument is unavailing.

First, Plaintiffs are sophisticated parties, who had the opportunity to consult counsel, if they had wished to do so. They are investors with business acumen, who invested a collective $850,000 into a small company. *See* Compl. ¶¶ 1, 22. The investment transaction was at arm's

length, and there was not a drastic imbalance in sophistication between Plaintiff investors and Defendants. *See Willard Packaging Co. v. Javier*, 169 Md. App. 109, 135 n. 20 (2006).

Second, Plaintiffs attempt to show that they were coerced into making a rapid decision, given that Jeffery stated that "[t]ime is the enemy of all deals" in his March 27 email expressing his desire to buy out Plaintiffs' notes. Compl. ¶ 64. They characterize the option as a "take it or leave it" deal. *Id.* ¶ 61. Yet nothing in the record reasonably demonstrates that Plaintiffs were prevented from contemplating the agreement or consulting counsel if they wished. In fact, Lipson said to Jeffery on March 28, 2014, "In the end I feel I was steamrolled and I could get a lawyer and probably fight some of this … but at this point I will just move on. Please get us the money as soon as possible, just want to put the experience behind us. Never saw this coming." Doc. 20-13 at 2, Ex. M to Opp'n. Lipson expressly chose *not* to use a lawyer, and his request for a rapid payout undercuts Plaintiffs' argument that they were not given the opportunity to contemplate the agreement or the Release. *See also* Compl. ¶ 73 (Letter from Lipson to Jeffery, stating, "I could have played tough businessman and lawyered up, etc. but playing ball with someone you distrust is not what I want to do at this point.").

If Plaintiffs wished for an integration clause or further disclaimers, they could have bargained accordingly. As mentioned *supra*, the Release encompasses any undiscovered facts. This Court will not look to parol evidence to determine the intent of parties when the terms of the Releases are plain and clear. Opp'n at 6. Plaintiffs were asked to sign a contract that was unambiguous, in a manner that was both fair and knowing.

*C. The Fraud Claims Were Contemplated by the Release*

Finally, Plaintiffs argue that they were fraudulently induced to sign the Releases by Defendants' misrepresentations. As the agreement released all claims, including known and

unknown "claims of any nature," the Release can be challenged based on fraudulent inducement only if Plaintiffs can identify a fraud that is separate and distinct from the claims discharged by the release. *See Marcus*, 2013 WL 2458347, at *8; *Morefun*, 2014 WL 2560608, at *4; *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 275 (2011).

The Note Payoff agreement, as this Court determined *supra*, clearly and unambiguously releases "any and all claims, known or unknown, suspected or unsuspected" that the Creditors, Plaintiffs, may have against the Released Parties, Defendants. Doc. 16-8 at 1−2. The Complaint's allegations, that Defendants defrauded Plaintiffs into selling their convertible notes, are not separate from the subject matter of the Note Payoff letter, which was an agreement for Defendants to pay out Plaintiffs for their investments. The Release must be read to encompass the fraud alleged in the Complaint, and thus Plaintiffs have no plausible claim for fraudulent inducement. *See Morefun*, 2014 WL 2560608, at *5; *see also O.F.I. Imports Inc. v. Gen. Elec. Capital Corp.*, 2016 WL 5376208, at *7 (S.D.N.Y. Sept. 26, 2016) (Caproni, J.).

*D. Attorneys' Fees*

The Note Payoff letters state, "In the event of any proceeding to enforce the terms of this letter, attorneys' fees, expenses and costs will be paid by the non-prevailing party to the prevailing party." Doc. 16-8 at 2. Plaintiffs again contend that the Court should not allow fee-shifting, because the agreement was fraudulently induced. This argument is unavailable. Accordingly, this Court orders Plaintiffs to pay Defendants' *reasonable* attorneys' fees, expenses, and costs.

**III. CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. If Plaintiffs wish to file an amended complaint, they shall do so by April 27, 2017. This Opinion resolves docket numbers 14 and 17.

SO ORDERED.

DATED: New York, New York
March 28, 2017

/s/
KIMBA M. WOOD
United States District Judge